IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:14-CV-173-RJ

| | |
|---|---|
| DONNA C. CARROLL, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

ORDER

This matter is before the court on the parties' cross-motions for judgment on the pleadings

[DE-26, DE-30] pursuant to Fed. R. Civ. P. 12(c). Claimant Donna C. Carroll ("Claimant") filed

this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her

application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing

responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully

reviewed the administrative record and the motions and memoranda submitted by the parties,

Claimant's Motion for Judgment on the Pleadings is denied, Defendant's Motion for Judgment on

the Pleadings is allowed, and the final decision of the Commissioner is upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on May 26, 2011,

alleging disability beginning August 1, 2009. (R. 15, 208-10). Her claim was denied initially and

upon reconsideration. (R. 78-106). A hearing before the Administrative Law Judge ("ALJ") was

held on February 19, 2013, at which Claimant was represented by counsel and a vocational expert

("VE") appeared and testified. (R. 36-77). On April 24, 2013, the ALJ issued a decision denying

Claimant's request for benefits. (R. 12-35). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 7), and submitted additional evidence as part of her request (R. 770-80). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on June 21, 2014. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq*., is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling*

2

*Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently
> working; and (2) must have a "severe" impairment that (3) meets or exceeds [in
> severity] the "listings" of specified impairments, or is otherwise incapacitating to the
> extent that the claimant does not possess the residual functional capacity to (4)
> perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails

at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65

F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the

first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ

to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with

the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies

four broad functional areas in which the ALJ rates the degree of functional limitation resulting from

a claimant's mental impairment(s): activities of daily living; social functioning; concentration,

persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required

to incorporate into his written decision pertinent findings and conclusions based on the "special

technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ improperly evaluated the medical opinion

evidence and failed to consider whether Claimant's use of a cane was medically necessary. Pl.'s

Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-27] at 13-19.

3

## IV. FACTUAL HISTORY

### A.     ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act.  At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment.  (R. 17).  Next, the ALJ determined Claimant had the following severe impairments: fibromyalgia, history of congestive heart failure, migraine, degenerative disc/joint disease, and multiple sclerosis.  *Id.*  The ALJ also found Claimant had nonsevere impairments of hypertension, surgical repair of a perforated viscus, and depression.  (R. 17-18).  However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 19-21).  Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in no limitations in her activities of daily living and social functioning, and mild limitation in concentration, persistence and pace with no episodes of decompensation which have been of extended duration.  (R. 18).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform sedentary work[1] with no climbing or balancing, and only occasional overhead work, crawling, crouching, and kneeling.  (R. 21).  Additionally, Claimant can have no exposure to temperature extremes, high humidity, pulmonary irritants, unprotected heights, or dangerous

---

[1]  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a); S.S.R. 96-9p, 1996 WL 374185, at *3 (July 2, 1996). "Occasionally" generally totals no more than about 2 hours of an 8-hour workday. "Sitting" generally totals about 6 hours of an 8-hour workday. S.S.R. 96-9p, 1996 WL 374185, at *3.  A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 1.  *Id.*

4

machinery. *Id.* In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 22-29). At step four, the ALJ concluded Claimant had the RFC to perform the requirements of her past relevant work. (R. 29-30).

## B.    Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 47 years old, 5 feet 4 inches tall, and weighed 133 pounds. (R. 42-43). Claimant is married, and her husband works. (R. 43). Claimant has a driver's license but does not drive due to recent surgery and restrictions imposed by her neurologist. *Id.* Claimant's husband and sister-in-law drove her to the hearing. (R. 44). Claimant has a high school education and can read and write. *Id.* Claimant has not worked since August 1, 2009, when she was employed at Southern States Fertilizer as the chief clerk, data manager, and assistant manager. *Id.* Claimant's work ended when the plant burned down, and she decided to file again for disability instead of trying to return to work. (R. 44-45). Claimant received unemployment benefits until the second quarter of 2011, and was actively looking for work during that period. (R. 45). Claimant attempted to work part time as a substitute for a county school system, but her knee and back problems prevented her from staying at that job due to the standing and walking requirements. (R. 45-46).

Claimant testified that she is currently unable to work because she cannot stand or sit for long periods of time and she has migraine headaches and memory problems. (R. 46). Claimant stated that she has continuous pain in her back, neck, head, and knees. *Id.* Claimant has sciatic nerve problems from two bulging disks in her lower back. *Id.* Claimant testified that when she is in a lot of pain, she either has to move around to try and relieve the pain or lie down. *Id.* Claimant takes Percocet, Wellbutrin, blood pressure medication, and heart medication. (R. 46-47). Claimant's

5

medications make her drowsy and nauseated, and she will sometimes have to take other medication to address her side effects. (R. 47). Claimant sees her primary treating physician, Dr. Rich, once a month. *Id.*

Claimant thinks she can sit for 15 minutes before her back will start hurting severely. *Id.* Claimant stated that she can stand for no more than 10 or 15 minutes before her knees start to hurt. *Id.* Claimant's neurologist, medical doctor, and her cardiologist have told her not to lift more than three to five pounds at a time. (R. 48). Dr. Rich has diagnosed Claimant with severe arthritis in both of her hands. *Id.* Claimant has also been treated for Fibromyalgia. *Id.* Claimant has seen her neurologist, Dr. Phillips, several times, and was scheduled to see him again after the hearing in May for another MRI to decide whether to start multiple sclerosis treatment. (R. 48-49). Claimant was originally treated at Wilmington Health Neurology, but was then referred to Dr. Phillips in Raleigh. (R. 49-50). Claimant's neurologist in Wilmington said she did not have multiple sclerosis, but after Claimant's pain persisted, she was referred to Dr. Phillips in Raleigh. *Id.* Claimant received more testing in Raleigh, along with medication, and if she has not improved in May, she will receive beta serum injections, which are used to treat multiple sclerosis. (R. 50).

Claimant is also treated by Duke Cardiology, and was last seen in November prior to the hearing. *Id.* Claimant has a prolapsed mitral valve, and the injection fraction is low with a moderate leakage. *Id.* Claimant testified that if the leakage continues, she will have to receive a valve replacement. *Id.* Claimant had heart surgery in 1995, and received a radiofrequency ablation. (R. 51). Claimant testified that her doctor is still monitoring her prolapsed mitral valve, because when it weakens or becomes too thick, she will need a valve replacement. (R. 51). Claimant has been to the hospital two or three times over the past two years for chest pain, and received monitoring and

6

stress testing. *Id.* The last time Claimant saw her cardiologist in Lumberton, her injection fraction was down to 34 percent. (R. 52).

Claimant testified that she has numbness and tingling in her feet and hands. (R. 53). When asked what was causing her peripheral neuropathy, Claimant responded "I imagine that they're talking about the lesions that are on my brain" and further stated that she believed the neuropathy was partially multiple sclerosis-related and partially related to her disc problems in her back and neck. (R. 53-54). Claimant indicated that she has sciatic nerve problems, and she was supposed to start physical therapy in January, but was unable to do so because of her recent surgery. (R. 54). Claimant was admitted to the hospital on January 15th, thinking she had a heart attack. (R. 55). Upon admission, it was discovered that Claimant's intestines had ruptured and she was bleeding through her abdomen. *Id.* Claimant received four units of blood and then had emergency surgery to reverse a gastric bypass that was performed in 2002. *Id.* Claimant's pancreas became inflamed, and her congestive heart failure medication had to be changed because it was causing complications with the pancreatitis. *Id.* Claimant was in the hospital for nine days, and then was re-hospitalized in February for a pancreatitis attack. (R. 55-56).

Claimant has not received any counseling for depression, although she takes Wellbutrin which is prescribed by Raleigh Neurology. (R. 56). Claimant was referred to counseling, but could not afford the treatments. *Id.* Claimant testified that her husband had to change his job just so she has medical insurance to be seen by her medical doctors. *Id.* Claimant testified that her Wellbutrin helps a lot with her depression. *Id.*

Claimant lives in a doublewide mobile home with her husband and two daughters, ages 9 and 19. (R. 56-57). Claimant testified that she is able to take care of her personal hygiene, although her

7

husband has had to help her in the past month and a half after her surgery. (R. 57). Claimant spends her day doing a lot of resting. *Id.* She testified that prior to her surgery, she would complete household tasks at her own pace. *Id.* Claimant stated that she cannot do a lot of bending, and the moving and twisting associated with vacuuming irritates her nerve problems in her leg. *Id.* Claimant's husband does the vacuuming and mopping, and Claimant generally has to have help getting laundry out of the top of her stacked washer and dryer. *Id.*

During the first part of the hearing, Claimant had to alternate between sitting and standing at least two times. (R. 58). Claimant stated that she was prescribed a cane, and has been using it for a year and a half or two years. *Id.* Claimant has also been wearing a knee brace for about a year and a half. *Id.* Claimant has been seeing Dr. Rich since before 2002, when he referred her for gastric bypass surgery. (R. 58-59). When Claimant changed jobs and started working in Lumberton, she saw Dr. Beasley, who treated her for Fibromyalgia. (R. 59). Claimant returned to Dr. Rich, who performed an MRI and first noticed signs of Multiple Sclerosis. *Id.* Dr. Rich referred Claimant to a neurologist in Wilmington, who then referred her to Dr. Phillips, a neurologist in Raleigh. (R. 59-60). Claimant is also treated in Raleigh by Deidra Frailer, who is a physician's assistant. *Id.* Frailer filled out the medical source statement, because Claimant usually sees the physician's assistant at her neurologist's office in Raleigh, and Dr. Phillips was unavailable at the time the statement needed to be completed. *Id.* Claimant also testified that she is normally treated by a nurse practitioner when she goes to her cardiologist's office unless she is having a major problem. (R. 60-61). Claimant stated that she saw the cardiologist for yearly checkups, but did not start going back continuously until her congestive heart failure began. (R. 61).

When asked to describe her pain on a scale of zero to ten where zero is no pain and ten is like

8

someone putting a hot poker in her side, Claimant stated that in late 2012 her day-to-day pain level was a nine, although sometimes it was a 15. *Id.* Claimant testified that since her onset date in August of 2009, both her health and pain levels have gotten continuously worse. (R. 62). Claimant stated that around Christmas of 2010, her pain was between a six and a seven. *Id.* Claimant testified that she thought she was going crazy in 2009 because she could not keep things together. *Id.* She had filed for disability in 2008 after being extremely sick, and tried to go back to work for as long as she could. *Id.* Claimant was having memory problems, knee and back problems, tinnitus, and migraine headaches, and left work again after eight or nine months. (R. 63). Claimant stated that her memory and concentration problems were related to her pain. *Id.* In August 2008, Claimant fainted and hit her head and injured her tailbone. (R. 64). She had to have a hysterectomy, and was out of work for three or four months. *Id.* Claimant went back to work and then left in July of 2009. *Id.*

Claimant described her abilities to do house work prior to her recent surgery. *Id.* In order to cook, Claimant would sit at the table and do as much as she could there, before bringing a stool over to the stove and sitting there. *Id.* Claimant has had five fainting spells that she recalls. *Id.* Claimant stated that when her husband was away for work, she did not cook as much. (R. 64-65). She would eat sandwiches and other items she could make without having to stand while she was alone. (R. 65). Prior to Claimant's recent surgery, in 2012, she would have to lie down three to five times a day to try and alleviate her pain. *Id.* Claimant testified that in 2011, she was having a lot of problems with migraines, and was lying down because of her pain more than once a day. (R. 66).

Claimant testified that she was present when the nurse practitioner filled out the RFC forms, and answered their questions. *Id.* When asked whether the cardiologists usually asked Claimant

9

about her orthopedic issues, Claimant responded that they are concerned about her orthopedic care because they saw Claimant using a brace and a cane. *Id.* Claimant testified that the nurse practitioners from the cardiologist's office performed an examination and would have noticed her leg and ankle problems when they indicated joint deformity nerve muscle findings and arthritic changes. (R. 67). Claimant also indicated that the nurse practitioner from Raleigh Neurology did not perform a cardiac examination, but did listen to Claimant's heart during the examination and indicated that Claimant had cardiac angina and objective signs of pain. (R. 67-68). Finally, Claimant confirmed that Dr. Rich signed and completed the RFC form dated August 30, 2012. (R. 72).

## C. Vocational Expert's Testimony at the Administrative Hearing

Jayaja Brown testified as a VE at the administrative hearing. (R. 69-72). After the VE's testimony regarding Claimant's past work experience (R. 69-70), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed three hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work as generally performed assuming the individual has the physical capacity to perform sedentary work not involving any climbing or balancing, occasional overhead work, crawling, kneeling, and crouching. (R. 70). The VE responded in the affirmative. *Id.* The ALJ then added the following limitations: no temperature extremes, high humidity, pulmonary irritants, unprotected heights, or dangerous machinery, and asked whether those limitations would affect the performance of the identified position. *Id.* The VE respond that the individual would still be able to perform that position. *Id.* The ALJ then asked whether there were any jobs available if, secondary to symptoms, the individual would require breaks of unpredictable duration and

10

frequency, to which the VE responded in the negative. (R. 70-71). The VE stated that his testimony was consistent with both the Dictionary of Occupational Titles and his observation of the jobs at issue. (R. 71).

Counsel for Claimant asked if the second individual would be able to work if he or she was off task for ten percent of the work day. *Id.* The VE responded that the limitation would add a burden on the employee under those conditions, but work would not be precluded. *Id.* Counsel then asked what percentage off task someone would need to be to preclude work, and the VE responded that an individual who was off task 15-20 percent of the time would not be able to maintain employment regardless of the employer. (R. 71-72). The ALJ then affirmed that if the medical source statement was found to be credible, there would be no jobs available for such an individual with those limitations. (R. 72).

## V. DISCUSSION

### A.    The ALJ's Consideration of the Medical Opinion Evidence

Claimant contends that the ALJ erred in evaluating the medical opinion evidence by improperly rejecting the opinions of Dr. Rich, Marla Lewis, and Deidre Fraller, and failing to mention the opinion of Dr. Allen. Pl.'s Mem. [DE-27] at 13-17. In response, the Commissioner argues that the ALJ did not err in evaluating the medical opinion evidence. Def.'s Mem. [DE-31] at 14-21.

The regulations require the ALJ to consider all evidence in the record when making a disability determination. 20 C.F.R. § 404.1520(a)(3). Regardless of the source, the ALJ must evaluate every medical opinion received. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.

11

*Id.* § 404.1527(c)(1). More weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most

12

cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at \*2 (E.D.N.C. Sept. 24, 2013) (unpublished) (citations omitted). However, "[f]orm reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudicative process." *Whitehead v. Astrue*, No. 2:10-CV-35-BO, 2011 WL 2036694, at \*9-10 (E.D.N.C. May 24, 2011) (unpublished) (determining that a check-box form completed by a treating physician was not entitled to controlling weight where it was inconsistent with the physician's own treatment notes and gave no explanation or reasons for the findings, leaving the ALJ unable to determine whether the physician applied the relevant regulatory definitions).

Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). "Only those statements . . . that reflect judgments regarding a claimant's prognosis or limitations, or the severity of symptoms," and not those which merely report subjective complaints of the claimant's pain, constitute medical opinions as defined in the regulations. *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5366967, at \*11 (E.D.N.C. Aug. 30, 2013) (unpublished) (citations omitted), *adopted by* 2013 WL 5350870 (E.D.N.C. Sept. 24, 2013).

Further, according to the regulations, a nurse practitioner is not considered an acceptable medical source. *See* 20 C.F.R. § 404.1513(a) (defining "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and

13

qualified speech-language pathologists). Even so, "evidence from other sources," including nurse practitioners, may be used "to show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 404.1513(d); *see also* S.S.R. 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (explaining that opinions from "other [medical] sources . . . may provide insight into the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to function"). As other medical sources, such as nurse practitioners, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians," their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. Thus, while opinions from other sources such as nurse practitioners must be weighed and considered by the ALJ, they are not "acceptable medical sources" as defined in 20 C.F.R. § 404.1513(a) and cannot be afforded controlling weight. *Id.* at *2.

### 1.    Dr. Rich's Opinion

Dr. Rich, Claimant's treating primary care physician, completed a "Medical Statement Regarding Physical Abilities and Limitations for Social Security Disability Claim" on August 30, 2012. (R. 286-87, 681-82).[2] Dr. Rich's opinion is a form questionnaire, where Dr. Rich filled in one narrative answer and otherwise simply circled or checked pre-written responses. *Id.* Dr. Rich indicated, by circling his answer, that Claimant could stand for 15 minutes at a time, stand for 60 minutes in a work day, sit for 60 minutes at one time, and sit for four hours in a work day, lift five pounds on an occasional basis, and lift no weight on a frequent basis. (R. 681). Dr. Rich indicated,

---

[2] Dr. Rich's opinion is included at two separate locations in the record–all citations going forward will refer to the copy of the opinion found at R. 681-82.

also by circling his answers, that Claimant could never stoop, work around dangerous equipment,

tolerate heat, cold, dust, smoke, fumes, or noise exposure; Claimant could frequently raise both arms

over shoulder level; Claimant could occasionally bend, balance, perform fine and gross manipulation

with both hands, and operate a motor vehicle; Claimant would frequently need to elevate her legs

during an eight-hour work day, Claimant needed a cane and a knee brace to ambulate, Claimant

suffers from severe pain, and Claimant would frequently need unscheduled interruptions to leave the

work station to alleviate pain during the day and would probably miss work frequently due to

exacerbations of pain. (R. 681-82). Dr. Rich indicated, by check mark, that Claimant has the

following objective signs of pain: joint deformity, nerve/muscle findings, arthritic changes, and

tenderness to palpation, and that Claimant will probably be unreliable as a result of her condition and

attendant limitations. *Id.*

> The ALJ specifically considered Dr. Rich's opinion, noting the following:
>
> [t]he possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite inistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Although Dr. Rich is the claimant's treating physician, the inconsistencies between his opinion and his treatment notes render it less persuasive. Nonetheless, the undersigned has included the restrictions against exposure to temperature extremes, high humidity, pulmonary irritants, unprotected heights, and dangerous machinery and the limitation to occasional overhead work out of some deference to Dr. Rich's opinion.

(R. 27).

As an initial matter, "[f]orm reports, in which a physician's only obligation is to check a box

or fill in a blank, are entitled to little weight in the adjudicative process." *Whitehead*, 2011 WL

2036694, at *9-10. Further, substantial evidence supports the ALJ's decisions for affording Dr. Rich's opinion limited weight. Primarily, the ALJ noted that the inconsistencies between Dr. Rich's opinion and his treatment notes provided a basis for affording the opinion less than controlling weight. Indeed, a review of Claimant's treatment notes reveals that Claimant's exam findings were largely normal. (R. 713–January 30, 2012 treatment note indicating Claimant had normal gait, all extremities had normal strength, and Claimant had normal coordination, stance, and gait); (R. 711–February 13, 2012 treatment note indicating no edema, deformities, or tenderness in extremities and that Claimant had normal gait and balance); (R. 708–February 23, 2012 treatment note indicating Claimant had a full range of motion in her back); (R. 700–August 30, 2012 treatment note indicating Claimant had slight right knee effusion and no instability); (R. 696–October 31, 2012 treatment note documenting Claimant's normal gait); (R. 694–November 12, 2012 treatment note indicating no edema, deformities, or tenderness in extremities and that Claimant had full range of motion and multiple tender points in her back). *But see* (R. 692–December 17, 2012 treatment note documenting that Claimant's knee problems and back pain were worsening). Additionally, Claimant routinely indicated that her pain level was zero on a scale of one to ten during treatment. (R. 691, 693, 695, 699, 702, 704, 706, 708, 710, 712).

In support of her argument, Claimant points to the consistency of Dr. Rich's opinion with the Lewis and Frailer opinions, and notes that in terms of supportability of medical opinions, the ALJ only specifically referred to Claimant's equivocal multiple sclerosis diagnosis and her ability to walk one to two miles per day, and attempts to discount those characterizations. However, it is insufficient for the Claimant to point to other record evidence and argue that the ALJ's decision is unfounded, *Frazier v. Astrue*, No. 4:06-CV-254-FL, 2008 WL 138050, at *14 (E.D.N.C. Jan. 10,

16

2036694, at *9-10. Further, substantial evidence supports the ALJ's decisions for affording Dr. Rich's opinion limited weight. Primarily, the ALJ noted that the inconsistencies between Dr. Rich's opinion and his treatment notes provided a basis for affording the opinion less than controlling weight. Indeed, a review of Claimant's treatment notes reveals that Claimant's exam findings were largely normal. (R. 713–January 30, 2012 treatment note indicating Claimant had normal gait, all extremities had normal strength, and Claimant had normal coordination, stance, and gait); (R. 711–February 13, 2012 treatment note indicating no edema, deformities, or tenderness in extremities and that Claimant had normal gait and balance); (R. 708–February 23, 2012 treatment note indicating Claimant had a full range of motion in her back); (R. 700–August 30, 2012 treatment note indicating Claimant had slight right knee effusion and no instability); (R. 696–October 31, 2012 treatment note documenting Claimant's normal gait); (R. 694–November 12, 2012 treatment note indicating no edema, deformities, or tenderness in extremities and that Claimant had full range of motion and multiple tender points in her back). *But see* (R. 692–December 17, 2012 treatment note documenting that Claimant's knee problems and back pain were worsening). Additionally, Claimant routinely indicated that her pain level was zero on a scale of one to ten during treatment. (R. 691, 693, 695, 699, 702, 704, 706, 708, 710, 712).

In support of her argument, Claimant points to the consistency of Dr. Rich's opinion with the Lewis and Frailer opinions, and notes that in terms of supportability of medical opinions, the ALJ only specifically referred to Claimant's equivocal multiple sclerosis diagnosis and her ability to walk one to two miles per day, and attempts to discount those characterizations. However, it is insufficient for the Claimant to point to other record evidence and argue that the ALJ's decision is unfounded, *Frazier v. Astrue*, No. 4:06-CV-254-FL, 2008 WL 138050, at *14 (E.D.N.C. Jan. 10,

2008) (unpublished), as this invites the court to re-weigh the evidence and substitute its own

conclusions for those of the Commissioner, *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Here, the ALJ properly considered the consistency and supportability of Dr. Rich's opinion. *See*

*Johnson*, 434 F.3d at 654. The court "must defer to the ALJ's assignments of weight unless they are

not supported by substantial evidence." *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015)

(unpublished) (citing *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012)). Where a treating

physician's opinion is inconsistent with his own treatment notes and other evidence of record, as is

the case here, the ALJ may give the opinion limited weight. *Id.* at 269 (citing *Meyer v. Colvin*, 754

F.3d 251, 256 (4th Cir. 2014)); *Craig*, 76 F.3d at 590. Although, there is some evidence in the

record which would lend support to Dr. Rich's opinion, there is more than a "scintilla of evidence"

supporting the ALJ's decision to afford little weight to these opinions. *Dunn*, 607 F. App'x at 271

(concluding the ALJ did not err in affording limited weight to a treating source opinion where "there

is more than a 'scintilla of evidence' in the record supporting the ALJ's conclusion that [the

physician's] opinion is incongruent with both his own treatment notes and some of the other medical

evidence in the record."). Accordingly, the ALJ did not err in evaluating Dr. Rich's opinion.

2.    **Marla Lewis's Opinion**

Marla Lewis ("Lewis"), a nurse practitioner with Duke Cardiology of Lumberton, completed

the same medical source statement form used by Dr Rich on September 7, 2012. (R. 288-89, 718-

19).[3] Lewis indicated, by circling her answer, that Claimant could stand for 15 minutes at a time,

stand for 60 minutes in a work day, sit for 60 minutes at one time, sit for four hours in a work day,

---

[3] Lewis's opinion is included at two separate locations in the record–all citations going forward will refer to the copy of the opinion found at R. 717-18.

17

lift five pounds on an occasional basis, and lift no weight on a frequent basis. (R. 717). Lewis indicated, also by circling her answers, that Claimant could never stoop, work around dangerous equipment, tolerate heat, cold, dust, smoke, fumes, or noise exposure; Claimant could frequently raise both arms over shoulder level; and Claimant could occasionally bend, balance, perform fine and gross manipulation with both hands, and operate a motor vehicle; Claimant would frequently need to elevate her legs during an eight-hour work day, Claimant needed an ambulation device to ambulate, Claimant suffers from severe pain, and Claimant would frequently need unscheduled interruptions to leave the work station to alleviate pain during the day and would probably miss work frequently due to exacerbations of pain. (R. 717-18). Lewis indicated, by check mark, that Claimant has the following objective signs of pain: joint deformity, nerve/muscle findings, cardiac/angina, arthritic changes, tenderness to palpation, and limitation of motion; and that Claimant will probably be unreliable as a result of her condition and attendant limitations. *Id.*

The ALJ specifically considered Lewis's opinion, noting the following:

[i]nterestingly, Ms. Lewis's physical examination of the claimant on that day did not document any of the indicated objective signs, other than abnormal results of the echocardiogram (Exhibit 24F). Pursuant to Social Security Ruling 06-03p, the undersigned has considered this medical opinion even though Ms. Lewis is not an "acceptable medical source" pursuant to 20 CFR 404.1513(a). The undersigned finds that her opinion provides little insight into the severity of the claimant's impairments and how they affect her ability to function, as it is inconsistent with objective findings contained in the medical evidence of record, including Ms. Lewis's treatment notes. This opinion is therefore accorded little weight.

(R. 27).

Here, the ALJ discounted Lewis's opinion because it was inconsistent both with her own treatment notes and other record evidence. *Id.* Despite Lewis's depiction of Claimant as extremely limited on the medical source statement, Lewis's treatment notes do not document such limitations.

18

(R. 663-65–March 9, 2012 treatment note documenting that wall motion abnormalities revealed during an exercise stress echocardiogram improved to normal with exercise, Claimant stated she had no chest discomfort or shortness of breath and she had complete resolution of all symptoms, no evidence of reversible ischemia, S1 and S2 without murmurs, gallops, or rubs, and Claimant had regular heart rate and rhythm, and recommending no further cardiac tests); (R. 667–February 16, 2012 treatment note indicating Claimant walked one to two miles as part of her daily exercise routine); (R. 670–May 28, 2010 treatment note indicating same); (R. 746–September 7, 2012 treatment note indicating Claimant's moderate mitral regurgitation was clinically stable, her cardiac medication regimen was adequate and hypertension was well-controlled, encouraging Claimant to increase physical activity as tolerated, and noting that annual heart monitoring would be continued). Accordingly, the ALJ properly considered the consistency and supportability of Lewis's opinion, *see Johnson*, 434 F.3d at 654, and Claimant's argument to the contrary is without merit.

### 3.  **Deirdre Frailer's Opinion**

Deirdre Frailer ("Frailer"), a nurse practitioner with Raleigh Neurology Associates, completed the same medical source statement form used by Dr. Rich and Lewis on December 28, 2012. (R. 715-16). Frailer indicated, by circling her answer, that Claimant could stand for 15 minutes at a time, stand for 60 minutes in a work day, sit for 30 minutes at one time, sit for two hours in a work day, lift five pounds on an occasional basis, and lift no weight on a frequent basis. (R. 715). Frailer indicated, also by circling her answers, that Claimant could never stoop, work around dangerous equipment, operate a motor vehicle, tolerate heat, cold, dust, smoke, fumes, or noise exposure; and Claimant could occasionally bend, balance, perform fine and gross manipulation with both hands, and raise both arms over shoulder level; Claimant would frequently need to elevate

19

her legs during an eight-hour work day, Claimant needed a brace on her right leg and a cane to ambulate, Claimant suffers from severe pain, and Claimant would frequently need unscheduled interruptions to leave the work station to alleviate pain during the day and would probably miss work frequently due to exacerbations of pain. (R. 715-16). Frailer indicated, by check mark, that Claimant has the following objective signs of pain: joint deformity, nerve/muscle findings, cardiac/angina, arthritic changes, disc abnormality, and limitation of motion; and that Claimant will probably be unreliable as a result of her condition and attendant limitations. *Id.*

The ALJ specifically discussed Frailer's opinion, noting as follows:

> [t]he undersigned finds that her opinion provides little insight into the severity of the claimant's impairments and how they affect her ability to function, as it is inconsistent with objective findings contained in the medical evidence of record, including Ms. Frailer's treatment notes. Notably, Ms. Frailer cited cardiac findings even though her evaluation of the claimant was performed only in the context of a neurology practice. This opinion is therefore accorded little weight.

(R. 28).

Here, the ALJ noted that Frailer treated Claimant in the context of a neurology practice, although the medical source statement includes cardiac findings and largely focuses on Claimant's physical and orthopedic issues. *Id.* These are appropriate factors to consider under the regulations, *see Johnson*, 434 F.3d at 654, and as discussed above, the severe limitations documented by Frailer in the medical source statement are inconsistent with the medical evidence of record showing Claimant routinely reported no pain upon examination and physical exam findings were largely normal. Thus, the ALJ properly considered Frailer's opinion and Claimant's argument as to this issue is without merit.

20

### 4. Dr. Allen's Opinion

Claimant contends that the ALJ erred by failing to discuss or weigh the opinion of Dr. Allen, Claimant's orthopedist, that Claimant was limited to one hour of walking and standing per day. Pl.'s Mem. [DE-27] at 15-17. Claimant argues that this limitation is inconsistent with the sedentary RFC assessed by the ALJ, which allows for two hours of walking and standing per work day. *Id.* In response, the Commissioner argues that Dr. Allen provided no medical opinion for the ALJ to discuss or weigh, as the standing and walking limitation was limited in duration to a period of two weeks. Def.'s Mem. [DE-31] at 19-21.

The statements at issue from Dr. Allen are found in treatment notes depicting Claimant's thoracic spinal injections and read as follows: "STAND/WALK: Limited to 1 hour. A DAY AT WORK." (R. 296–October 21, 2010 treatment note); (R. 607–October 31, 2011 treatment note). Immediately after that statement, each treatment note then reads: "RETURN VISIT: Patient is instructed to follow-up in 2 weeks. If there are any problems, patient should return prior to scheduled visit." *Id.* Claimant had one prior spinal injection, on September 21, 2010, and the restriction noted in the treatment note from that date reads: "RESTRICTIONS: PATIENT MAY PERFORM ACTIVITIES AS TOLERATED." (R. 298). Taking the context into consideration, that these restrictions were imposed after Claimant received a specific medical procedure, these limitations do not appear to be permanent in duration, but rather are temporary. This conclusion is bolstered by the fact that immediately following the restriction to one hour of standing and walking, Claimant is instructed to follow up with the doctor in two weeks. As defined by the Social Security regulations, medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s),

21

including [the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Where the limitations at issue are limited in duration to two weeks, these limitations do not constitute medical opinions as defined by the regulations, and there is no error in the ALJ's failure to specifically weigh those opinions. Here, the ALJ considered the treatment notes of Dr. Allen, noting that Claimant demonstrated improvement after receiving joint injections, despite some osteoarthritic changes and degenerative joint disease. (R. 23-24). Further, even if the limitations do constitute medical opinions under the regulations, there is no failure to weigh them where they are temporary in nature. *Cf. Lamb v. Astrue*, No. 3:07-CV-789, 2008 WL 4890580, at *4 (E.D. Va. Nov. 12, 2008) (unpublished) (determining that the ALJ did not err in failing to weigh a temporary work limitation which was to last six months from the date of onset where that opinion was consistent with other record evidence as to the claimant's current condition and where that limitation was only temporary in nature). Accordingly, Claimant's argument as to this issue is without merit.

**B.     The ALJ's Consideration of Claimant's Use of a Cane**

Claimant contends that the ALJ erred by failing to consider whether her use of a cane was medically necessary and if so, how Claimant relied upon the cane and how it affected her RFC. Pl.'s Mem. [DE-27] at 17-19. In response, the Commissioner argues that the ALJ did not err because Claimant failed to meet her burden of demonstrating that the cane was medically required. Def.'s Mem. [DE-31] at 21-23.

Social Security Ruling 96-9p requires, *inter alia*, consideration of the impact of medically-required hand-held assistive devices on the unskilled sedentary occupational base. S.S.R. 96-9p, 1996 WL 374185, at *7 (July 2, 1996). However, "[t]o find that a hand-held assistive device is

22

medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, *and describing the circumstances for which it is needed* (i.e., whether all the time, periodically or only in certain situations . . . .)." *Id.* (emphasis added). If an assistive device "is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded" as sedentary unskilled occupations require minimal lifting and carrying. *Id.* In contrast, if the device is required for "balance because of significant involvement of both lower extremities," the sedentary occupational base "may be significantly eroded," thereby requiring the testimony by a VE. *Id.*

Here, in support of her argument that the cane is medically necessary, Claimant points to her hearing testimony that she had been using a knee brace and a prescribed cane for about a year and a half. Pl.'s Mem. [DE-27] at 17; (R. 58). Claimant also notes that her description of her cane as prescribed is consistent with the August 2012 opinion of her primary care physician, Dr. Rich, the September 2012 opinion of her cardiac nurse practitioner, and the December 2012 opinion from her neurology nurse practitioner. Pl.'s Mem. [DE-27] at 18; (R. 681-82, 715-18). However, despite Claimant's testimony that the cane was prescribed, the record does not include an actual prescription for use of the cane. Further, while presumably Dr. Rich would have prescribed the cane as Claimant's primary care physician, a review of his treatment notes demonstrates a lack of discussion of Claimant using a cane. (R. 691-713). The opinions of Dr. Rich, Frailer, and Lewis all include the following: in response to "Need to use an assistive device to ambulate," all three circled "yes." (R. 681, 715, 717). In response to the follow-up question of "If yes, what kind?" Dr. Rich responded "cane, knee brace" (R. 681), Frailer responded "brace on rt leg, cane" (R. 715), and Lewis responded

"ambulation device" (R. 717). None of these responses to the pre-written form constitute "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing," and importantly, there is no documentation in the record "describing the circumstances for which [the assistive device] is needed . . . ." S.S.R. 96-6p, 1996 WL 374185, at *7.

Further, the medical records demonstrate that it is unclear whether Claimant's level of mobility is impacted to a degree that Claimant's use of a cane is required at all times, despite Claimant's hearing testimony that she has used a cane as prescribed for one and a half to two years. (R. 268–third party function report completed by Claimant's husband on August 21, 2011, indicating that Claimant uses a cane but noting that crutches are the only assistive device used by Claimant that was prescribed by a doctor); (R. 632–DDS consultative exam performed by Dr. Ferriss Locklear on December 7, 2011, noting that Claimant's "[g]ait is steady. A cane was not required for ambulation."); (R. 664, 667, 670–treatment notes from Lewis, dated May 28, 2010, February 15, 2012, and March 9, 2012, noting that Claimant "stated that she walks approximately 1-2 miles daily as part of her regular exercise routine."); (R. 711–February 13, 2012 treatment note from Dr. Rich, noting Claimant had normal gait and normal balance); (R. 746–September 7, 2012 treatment note from Lewis, stating that Claimant "is also encouraged to increase her physical activity as tolerated and to follow a heart-healthy lifestyle including heart-healthy diet.").

Additionally, the evidence incorporated by the Appeals Council consisted of a Physical RFC Medical Source Statement, completed by an unknown person on July 29, 2013. (R. 5, 777-80). The medical source statement includes the following question: "While engaging in occasional standing and walking, must your patient use a cane, quad cane, walker, wheel chair or other assistive device(s) and will it/they affect your patient's ability to ambulate?" (R. 779). In response, the person who

24

completed the medical source statement indicated "Yes" and checked beside "All surfaces" and "Prolonged ambulation." *Id.* Initially, it is unclear who completed this medical source statement. The person indicated that he or she has treated Claimant monthly since 2003. (R. 777). Even assuming, based on the length of treatment, that Claimant's primary care physician Dr. Rich completed this medical source statement, it is still unclear as to whether this medical source statement refers to the relevant time period at issue, or the time period after the ALJ's decision. Accordingly, the evidence of record does not establish that Claimant's use of a cane is medically necessary. *See Eason v. Astrue*, No. 2:07-CV-00030-FL, 2008 WL 4108084, at *16 (Aug. 29, 2008) (unpublished) (determining that Claimant failed to demonstrate that her cane was medically necessary when the record contained a prescription for the cane but did not include any records describing the circumstances for which the cane was needed and medical records also demonstrated that Claimant's medical providers encouraged her to remain active). Claimant's argument on this issue is thus without merit.

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-26] is DENIED, Defendant's Motion for Judgment on the Pleadings [DE-30] is ALLOWED, and Defendant's final decision is affirmed.

So ordered, this the 30th day of September 2015.

Robert B. Jones, Jr.
United States Magistrate Judge

25